IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NICOLE G. ELKIN, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:13-0110 |
| ) | Chief Judge Haynes |
| v. ) | |
| ) | |
| JOHN M. McHUGH, Secretary of the ) | |
| Army, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff, Nicole G. Elkin, filed this action under Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., against the Defendant John M. McHugh, Secretary of the Army. Plaintiff asserts claims for a hostile work environment allegedly created by an Army employee at its Fort Campbell facility. Plaintiff alleges that she filed administrative charges and after two investigations of those charges, Plaintiff alleges that the same Army employee became angrier and aggressive towards Plaintiff.

Before the Court is the Defendant's motion to dismiss or in the alternative for summary judgment (Docket Entry No. 16) contending, in sum that at all relevant times, Plaintiff was an employee of SERCO, Inc., a government contractor and the Defendant was not Plaintiff's employer. In her response, Plaintiff submits her affidavit to assert, in essence that the Army controlled her job duties and that the Army is a joint employer who is liable under Title VII for the hostile work environment created by an Army employee.

1

## A. Findings of Fact[1]

SERCO, Inc., is a private entity that contracted with the Department of the Army to provide victim advocacy services at the Fort Campbell, Kentucky facility. Under this contract, SERCO was "responsible for . . . reports that support both Army and DOD requirements." (Docket Entry No. 18, MacMillan Declaration, Exhibit 1). This contract required SERCO employees to accept patient referrals from the Army's "Family Advocacy Program manager. Id. at ¶ 7. SERCO's employees services were to be provided "at Army installations . . ." and to "be located with headquarters staff or contractors facilities in close proximity to fully support VAP Staff." Id. at ¶ 11. SERCO's contract also incorporated Federal Acquisition Regulation ("FAR") Part 52.222-26 that required the contractor to implement an Equal Opportunity ("EO") program consistent with federal guidelines and to "post in conspicuous places available to employees and applicants for employment" notices and information about the contractor's EO program. (Docket Entry No. 19, Bobby Declaration at Exhibit 1).

As to the specific services, the "Order for Supplies or Services" provides that SERCO was to "[d]evelop, maintain, and update, a written Standard Operating Procedure ... for the administrative and operational control of contractor requirements." (Docket Entry No. 18-1 at 5). SERCO was required to "develop and maintain an effective quality control program." Id. at 29. The

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes finding of facts.

administrative requirements included "processes to evaluate performance" of its employees. Id. at 6. Training was required within 30 days after approval of the training standards that are to be published and within 30 days of an employee's hiring date. Id. at 13, 14, 28. SERCO was required to "provide comprehensive services to include training, advocacy, research, crisis intervention, and followup services to assist and advocate for victims of domestic abuse". Id. at 5. Under this contract, the Army "shall have the right **to request** the contractor [to] replace any individual." Id. at 22 (emphasis added).

SERCO hired Plaintiff as a victim advocate to work at Fort Campbell's FAP office. The Army provided Plaintiff with a computer and office space, but SERCO provided Plaintiff with a cellular telephone. (Docket Entry No. 18, MacMillan Declaration, Exhibit 2). Plaintiff reported to a SERCO employee, Id. at Exhibit 3, and SERCO approved Plaintiff's leave request. Id. SERCO conducted Plaintiff's performance evaluation with some input from the Army personnel. Id. at Exhibit 2, Summary of Interview with Louis Sumner, March 12, 2012.

On February 29, 2012, Plaintiff filed a administrative complaint with the Fort Campbell EEO office for alleged racial and religious discrimination as well as retaliation. (Docket Entry No. 18-4) At that time, Plaintiff was represented by her current counsel and Plaintiff listed under the heading on the EEOC charge form the "NAME OF AGENCY WHERE EMPLOYED Serco Contractor PMO" Id. at 1, 2. Plaintiff did not file an EEO complaint under the SERCO employment plan. On April 23, 2012, Fort Campbell EEO office dismissed Plaintiff's charge under 29 CFR 1614.107(a)(1) because Plaintiff was a SERCO employee, not an Army employee. Id. at Exhibit 5.

Plaintiff appealed that decision to the EEOC's Office of Federal Operations ("OFO"). Id. at Exhibit 6. OFO reviewed Plaintiff's EEOC complaint and the Agency's EEO's documentation

of her complaint. In its review of the record, the OFO noted that the Sexual Assault Response Coordinator (SARC"), a Serco employee, informed Plaintiff that Brown who is referred to as "Manager 1", was not Plaintiff's supervisor: "The SACR wrote that Manager 1 was not the supervisor for any of the SERCO Inc. contractors, despite her claim that she supervised Complainant", Plaintiff. (Docket Entry No. 18-7 at 4). The OPO also stated that "The SARC wrote that she and another SERCO Inc. employee were the primary trainers for the victim advocates on sexual assault. The record contains an email by the SARC to Manager 1 reprimanding Manager 1 for providing sexual assault training because she gave incorrect information and asking her to discontinue such training" Id. at 3. Significantly, OPO stated that: "In her memo, Complainant referred to someone other than Manager 1 being her immediate supervisor. Following the Agency's dismissal of her complaint, Complainant filed the instant appeal. On appeal Complainant, by and through her attorney, contends that she is supervised by Manager 1". Id. at 4. Yet, the OFO also stated that "Manager 1 assigned some work to Complainant and other victim advocates and established working hours". Id at 2.

According to the OFO, Plaintiff did not dispute the declaration of Louie Sumner, the FAP Manager on Plaintiff's job duties and supervision.

> . . . SERCO held the contract to provide us with victim advocate services. The Complainant, Ms. Nicole Elkin, was a SERCO employee . . . under that contract. For a considerable period of time in the past, SERCO had advised their victim advocates not to tell the FAP Manager (myself) anything about what they were doing. It was very difficult to find out what any individual advocate might have been working on and the SERCO Lead was almost exclusively responsible for oversight of the work of SERCO employees. . . During the time that SERCO held the contract, the Lead Victim Advocate was a SERCO employee . . . she was responsible to SERCO for all time attendance and leave requests of SERCO employees. For leave requests, [she] received them from the SERCO employee, informed me when a SERCO employee wanted to take leave and she then forwarded the leave request to SERCO to approve

4

> or disapprove. . . [she] also reported time and attendance records to me on a monthly basis in accordance with the contract. . . I did not establish the work hours of individual SERCO employees and I am well aware that our Victim Advocates are often "on call," meaning they could be called out at night or over a weekend. The Lead [SERCO employee] monitored the hours of the individual SERCO employees. I trusted [her] completely.

Id. at Exhibit Declaration of Mr. Louie Sumner, June 7, 2012. Plaintiff responds that she was unaware of this submission that was unavailable to her during the OFO review process. (Docket Entry No. 28-2 at 4).

At some point during the administrative process, Louie Sumner, the Army's supervisor for this project completed an "EEO Joint Employer Guidance" form that reads as follows:

> 1. Does a contract describing the working relationship between the individual and the Army exist? YES
>
> 2. Are you the contracting Officer's Representative or Army official responsible for the project the individual is working on? Please provide your name, title, phone number, and e-mail address, and provided the same information for any other key players.
> Shannon Berntson, Lead at the time, (270) 798-8601(current job);
> shannon.l.berntson.ctr@mail.mil;
> Christina Lopetz- Current Lead, (270) 412-5500; christina.e.lopez.ctr@mail.mil
>
> 3. How is the individual paid and who determines his/her rate of pay?
> Individual is paid by SERCO, the Contracting Company
>
> 4, What type of work does the individual do for the Army?
> The individual is a Victim's Advocate at the MP Station on Ft. Campbell, KY.
>
> 5. Is there an end product you expect at the completion of the individual's contract? If so, what is it and when is it due? NA
>
> 6. Who assigns work to the individual? The Victim's Advocate, (Tereasa Brown GS-11)
>
> 7. Does the individual report to an office provided by the Army? Yes, at the MP Station on Ft. Campbell, KY.
>
> 8. What equipment, materials and supplies does the individual need to do his/her work for the Army and who provides them? A computer, office space provided by the Army and a cell

phone provided by the Contractor.

9. Does the individual do work for anyone else besides the Army? Not to his knowledge

10. If a government contractor employs the individual, does that contractor provide an on-site supervisor? No on-site supervisor

11. Does the Army/DFAS withhold social security taxes or other taxes from the individual's compensation? No

12. Does the Army provide medical insurance for temporary or long-term disabilities?

13. Does the Army reimburse the individual for any expenses? If so, who prepares it and what input do Army officials provide? No

14. How were the individual's working hours established? The FAP Manager establishes the working hours.

15. Who determines whether the relationship between the individual and the Army will continue and on what basis is that determination made? The Contractor makes that decision.

16. Is a performance evaluation prepared on the individual? If so, who prepares it and what input do Army officials provide? The Contractor does the evaluation. Army officials have little input.

17. To whom does the individual submit leave requests, and who approves those requests? The leave requests are submitted to the Lead then to the FAP Manager and the Contractor approves it.

18. What are the details of any documents or conversations showing that the individual was not being hired as an employee of the Army? The resumes submitted to the Army officials by the Contractor Company displaying their selection of employee indicates that the employee was being hired solely as a contract employee and not an Army employee.

(Docket Entry No. 18-2 at 1-2)

On November 8, 2012[2], applying the common law test of agency in the EEOC regulations and adopted by the Courts, the Army's EEOC's OFO found that several factors favored Plaintiff as

---

[2] During the administrative appeal in April, 2012, SERCO lost its contract with the Army for the services at issue. (Docket Entry No. 18-7 at 2 n.2 )

an Army employee status, but that more factors under this test, coupled with the SERCO contract, led the OFO to affirm the agency's decision. The OFO found "that the Agency did not exercise sufficient control over [Plaintiff's] position to qualify as her employer or joint employer for the purpose of the EEO complaint process." Id. at Exhibit 7.

According to Plaintiff, the first two weeks of her work was as Brown's personal secretary. Brown needed her assistance to prepare for accreditation. (Docket Entry No. 28-1, Elkin's Affidavit). Plaintiff's duties for that assignment included shreding document files, photographs, emails and restricted report information. Id. Plaintiff asserts that some tasks were on Plaintiff's personal time. Id. Plaintiff contacted a SERCO supervisor who instructed Plaintiff to contact Louis Sumner, an Army employee and site supervisor. According to Plaintiff, Sumner instructed her not to come to the office on her time off and dictated Plaintiff's schedule. Plaintiff asserts that Brown continued to call Plaintiff at home to demand Plaintiff assist her on off duty time and to attend staff meetings. Id. at ¶ 4.

Plaintiff insists that Army employees signed her leave requests and that SERCO's advocate instructed Plaintiff to submit her leave slip to Sumner. Yet, Plaintiff does not dispute the Defendant's proof that leave forms required Army employees' signatures, but only Shannon Berston, SERCO's Lead Victim Advocate decided SERCO employees' leave requests. (Docket Entry No. 18-3 at 2, Sumner Declaration). Plaintiff also does not dispute that Army personnel had difficulty with any access to information on the victim advocates' work. Id.

According to Plaintiff, Sumner assigned Plaintiff to the Military Police Station and determined her hours. (Docket Entry No.28-1, Elkin's Affidavit at ¶ 11). Plaintiff also states that Brown assigned her work, not SERCO. Plaintiff cites mandatory weekly supervisory meetings with

7

Brown and a monthly meeting on supervision and handling of cases. Plaintiff asserts that Brown trained Plaintiff on case management and termination of clients as required by the Department of the Army. Id. at ¶ 8. Plaintiff has a Bachelor of Arts in Social Work from California State University of Northridge and a Masters of Social Work from the University of California of Los Angeles. Plaintiff is a licensed Clinical Social Worker in Illinois and a Licensed Master of Social Work in Tennessee. Id. at ¶1.

### B. Conclusions of Law

The Defendant's motion to dismiss attaches evidentiary materials beyond the allegations in Plaintiff's complaint. The Court deems it necessary to consider those materials on the parties' dispute. Thus, the Defendant's motion to dismiss is converted into a motion for summary judgment and is governed by Fed. R. Civ. P. 56. See Fed R. Civ. P. 12 (d). Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). Upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. See Liberty Lobby, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. See Id. at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." Id.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any [employee or applicant for employment] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[E]mployment status is a mixed question of law and fact." Sanford v. Main Street Baptist Church Manor, Inc., 327 Fed. Appx. 587, 595 (6th Cir. 2009). In the absence of disputed material facts or the possibility of conflicting inferences to be drawn from undisputed facts, employment status is a question for the court to resolve as a matter of law. Sanford v. Main Street Baptist Church Manor, Inc., 449 Fed. Appx. 488, 491 (2011)

As to whether an individual is an "employer" under Title VII, the Sixth Circuit adopts the common law of agency test. Shah v. Deaconess Hosp., 355 F.3d 496, 499 (6th Cir. 2004) (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992). Under this test, "[the] analysis requires the consideration of numerous factors, including:

> the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

Id. at 499-500 (citing Simpson v. Ernst & Young, 100 F.3d 436, 443 (6th Cir 1996)).

To be a joint employer, VII requires the two entities to "share or co-determine those matters governing essential terms and conditions of employment." Carrier Corp. v. NLRB, 768 F.2d 778, 781 (6th Cir. 1985). The major factors are the authority to hire, fire, discipline, affect compensation and benefits, and direct and supervise performance. "An individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the

plaintiff's hiring, firing or conditions of employment." Kauffman v. Allied Signal, Inc., Autolite Div. 970 F.2d 178, 185 (6th Cir. 1992) (quoting Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir.1989), modified on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc)).

Here, the Army required Plaintiff to work in an Army office, but the Army lacked the authority to hire, fire, discipline or affect Plaintiff's compensation and benefits. The Army neither withheld social security or other taxes from the Plaintiff's compensation nor provided medical benefits to the Plaintiff. (Docket Entry No 18-2). In a March 12, 2012 interview, Sumner, the Army's FAP Manager stated that SERCO conducted Plaintiff's performance evaluations with some input from the Army. SERCO's Lead Victim Advocate distributed work assignment to the SERCO employees. "For a considerable period of time in the past, SERCO had advised their victim advocates not to tell the FAP Manager (myself) anything about what they were doing. It was very difficult to find out what any individual advocate might have been working on and the SERCO Lead was almost exclusively responsible for oversight of the work of SERCO employees. . .". Id.

The Court concludes that Plaintiff's proof of work as Brown's "personal secretary" on accreditation and Brown's call to Plaintiff's personal cell telephone during this accreditation support work are insufficient facts to establish the Army as Plaintiff's joint employer. Given SERCO's contractual requirements for hiring, firing, compensation and performance evaluation of Plaintiff as well as the Army personnel's restricted access to information necessary to evaluate Plaintiff's work as a victim advocate, the Court concludes that the majority of the factors under the common law test for joint employer under Title VII do not favor a finding that the Army was a joint employer of the Plaintiff. Plaintiff's conclusory factual assertions about Brown's assignment of her work are insufficient to support a judgment for joint employer given SERCO's decisions to hire and to

evaluate Plaintiff's work. Moreover, SERCO's authority to fire Plaintiff as well as to set and control her compensation. For these collective reasons, the Court concludes that the Defendant's motion to dimiss or for summary judgment (Docket Entry No. 16) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 7th day of January, 2014.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court